THIRD DIVISION
June 14, 2006

No. 1-05-1617

| | | |
|---|---|---|
| SANDRA KRIVANEC, as Special Administratrix of the Estate of George Krivanec, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 00 L 8793 |
| v. | ) ) | |
| BRUCE M. ABRAMOWITZ, | ) ) | Honorable Robert E. Gordon, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Sandra Krivanec as special administratrix of the estate of George Krivanec, brought this action under the Wrongful Death Act **740 ILCS 180 0.01 et seq. West 2002** to recover damages for Krivanec's death allegedly caused by defendant Dr. Bruce M. Abramowitz's negligent care and treatment.[1] The jury returned a verdict in favor of plaintiff and the trial court entered a judgment on the verdict. On appeal, defendant contends that: (1) the trial court erred in denying his motion for a directed verdict and judgment notwithstanding the verdict because plaintiff failed to prove that defendant's negligence proximately caused Krivanec's injuries; (2) the trial court abused its discretion in refusing to grant defendant a new trial based upon various erroneous evidentiary rulings; and (3) the trial court erred in giving plaintiff's

---

[1] The other party-defendants settled prior to trial, leaving defendant as the only party-defendant in the case.

1-05-1617

version of Illinois Pattern Jury Instructions Civil, No. 31.04 where it was not supported by the evidence. For the following reasons, we reverse the judgment of the circuit court.

BACKGROUND

The relevant testimony at trial revealed that Krivanec was 54 years old with a history of chronic asthma and heart disease. On May 22, 1998, he was admitted through the emergency room at Christ Hospital after displaying symptoms of chest tightness, angina, shortness of breath, and a cold sweat. Defendant, a cardiologist, was brought in by the attending physician for a consultation and ordered certain tests. Krivanec's cardiac work-up was abnormal. He was discharged on May 24, 1998, with directions to follow up with his treating cardiologist, Dr. Pascale, within a week. Krivanec saw Dr. Pascale on July 21, 1998. At that time, he changed Krivanec's medications, but did not perform an angiogram. Thereafter, Krivanec suffered a heart attack on August 9, 1998, was hospitalized again, and ultimately died on September 24, 1998.

Plaintiff's theory of the case was that defendant failed to inform Krivanec of his abnormal stress test, failed to inform him of his increased risk of heart attack, and failed to advise him that he needed an angiogram. As a result, his treating doctor was deprived of an opportunity to properly diagnose and treat his condition. Had he had an angiogram within the week or so of his discharge, it would have revealed the need for further treatment which would have prevented his fatal heart attack.

Dr. Jong-Yoon Yi, a cardiac fellow at Christ Hospital at the time of Krivanec's initial hospital stay, testified that defendant had ordered a stress test to evaluate Krivanec's breathing difficulty and to determine if he had coronary ischemia (a lack of blood to the heart muscle). Dr.

- 2 -

1-05-1617

Yi was responsible for performing the test. The test revealed that Krivanec had a significant narrowing of his coronary arteries and indicated that he had exercised-induced ischemia. According to Dr. Yi, the only definitive way to tell which arteries were blocked was to perform an angiogram. Thus, it was his opinion that a reasonably well-qualified cardiologist should have recommended that Krivanec have an angiogram. Alternatively, on cross-examination, Dr. Yi testified that it would have been reasonably prudent for defendant to have returned Krivanec to his prior treating cardiologist with whom he had a relationship for his recommendations. He agreed that the discharge instructions indicated that Krivanec was to follow up with his own treating cardiologist within the week.

Defendant initially testified as an adverse witness. He was called upon for a consult because of Krivanec's history of coronary artery disease. He ordered a stress test because he needed to rule out a progression of the disease or change in symptoms that might be attributed to Krivanec's heart. Dr. Yi informed defendant that the results of the stress test were markedly abnormal. Defendant testified that this information was not unexpected given Krivanec's known medical history. At the time, defendant did not have the results of Krivanec's previous angiogram and did not know what arteries were blocked or to what extent they were blocked. He agreed that the only definitive way to know that information was to perform an angiogram. He testified that was one of the reasons he insisted that Krivanec go back to his treating doctor within a week.

According to defendant, he had a conversation with Krivanec during his initial evaluation. Defendant told Krivanec that his plan was to perform the stress test to evaluate

Krivanec's symptoms and to make sure his cardiac status was stable. If his status was unstable, then further testing would have to be done, including an angiogram. According to defendant, Krivanec then informed him that he desired to return to his own treating cardiologist, Dr. Pascale, for any further necessary cardiac treatment. That conversation was not documented in the hospital records. The medical records did indicate that pending the results of the stress test, defendant had contemplated that Krivanec might need an angiogram if the test results were abnormal.

Defendant further testified that he believed that Krivanec's condition was stable enough to discharge him and allow him to follow up with his own cardiologist within the week. He did not tell Krivanec that he was at an increased risk for a heart attack. He did not note in the chart that he told Krivanec he needed an angiogram. Defendant acknowledged that if an angiogram were done and showed a greater than 70% occlusion of the left anterior descending coronary artery, the standard of care would have required Krivanec to undergo either an angioplasty with stent placement or coronary artery bypass surgery.

Plaintiff's expert, Dr. Timothy McDonough, testified that Krivanec's symptoms and test results were consistent with unstable angina, which created an increased risk of a heart attack. Accordingly, it was Dr. McDonough's opinion that defendant deviated from the standard of care in reaching the conclusion that Krivanec's angina was stable. Dr. McDonough did not testify that defendant should not have discharged Krivanec or that defendant should have performed an angiogram. Rather, Dr. McDonough opined that defendant primarily breached the standard of care in the way he recommended follow-up care to Krivanec. He stated that the standard of care

required defendant to inform Krivanec that he was at an increased risk of mortality and inform him that he needed an angiogram to further evaluate his cardiac condition.

In Dr. McDonough's opinion, it was not enough to tell Krivanec to follow up with his own cardiologist. Dr. McDonough stated that this was minimal advice for someone who had known heart disease, was admitted through the emergency room with symptoms that were initially thought possibly due to an exacerbation of his heart disease, and had a very abnormal stress test. It was Dr. McDonough's opinion that simply telling the patient to see his doctor did not "add anything" to the advice that the doctor gave the patient. He further stated that patients often have desires that are not necessarily in their best interest. Since they do not have the medical background or understanding of their condition, they need to have the doctor explain the recommendations, what the consequences would be if they are not followed, or what the consequences would be if the patient was transferred to another hospital, or if care was delayed. Dr. McDonough stated that the key point is that a patient needs to make an informed choice whether to proceed or not in that manner, emphasizing the word "informed."

Dr. McDonough further testified that defendant's negligence contributed to Krivanec's death. It was his opinion that had Krivanec had an angiogram within a week or so after his hospitalization, it is likely that it would have shown a significant change in his coronary arteries such that the standard of care in 1998 would have likely been a recommendation for bypass surgery. If he had undergone coronary artery bypass surgery, it would have most likely prevented his fatal heart attack.

Dr. Lourdes Floro testified that she was Krivanec's treating asthma physician and was

responsible for his asthmatic condition during his May hospitalization. In that respect, she testified that Krivanec had an acute exacerbation of his asthma which improved during his hospital stay. She discharged Krivanec from the hospital with directions to take certain medications and to follow up with her on May 26, 1998, which he did. About one month after his discharge from the hospital, Krivanec saw another asthma doctor in the same practice, Dr. Chua-Apolinario. In taking Krivanec's recent medical history, Krivanec conveyed to her that he was "discharged [from the hospital] with the conclusion that his chest symptoms were due to his asthma because the cardiac work-up was negative." On July 21, 1998, Krivanec saw his treating cardiologist, Dr. Pascale, because he was experiencing pain in his jaw and numbness in his arm. At that time, Dr. Pascale changed Krivanec's medications. He did not order an angiogram.

Thereafter, on August 9, 1998, Krivanec had a heart attack and was readmitted to Christ Hospital. Dr. Hugo Cuadros was the physician in charge of Krivanec's care and treatment for that admission. An angiogram showed that his right coronary artery was 100% occluded, his left anterior descending artery was totally occluded and the circumflex artery was 90% occluded. Thereafter, Krivanec underwent angioplasty, a stent placement, and cardiac bypass surgery. Ultimately, the surgery proved unsuccessful because Krivanec's heart was unable to pump enough blood to his vital organs. He suffered multiple organ failure and died 45 days later on September 24, 1998.

Dr. Cuadros believed that there was no way to render an opinion with reasonable medical certainty as to when Krivanec's occlusion in the left anterior descending artery reached 90%. It could have been minutes before the clot or it could have been hours or days prior, or it could

have been there for several months if the patient was stable.

Krivanec's wife, Sandra Krivanec, testified that on May 22, 1998, Krivanec had called her to say he thought he was having a bad asthma attack and needed help. While at the hospital, nobody gave her the results of the stress test. Nobody told her that the stress test had shown that Krivanec's heart was not getting enough blood or oxygen. Nobody told her that an angiogram should be performed immediately. Two days after Krivanec's discharge, she went with him to the hospital with a request for his medical records.

At the close of plaintiff's case, defendant moved for a directed verdict, asserting that plaintiff failed to introduce competent evidence on the issue of proximate cause. The motion was taken under advisement at that time. Thereafter, defendant testified during his case that based upon Krivanec's history of heart attack, blocked arteries, and the test results, defendant believed that the standard of care did not require him to recommend an angiogram or suggest that Krivanec was at some immediate great risk. His cardiac risk was the same when he left the hospital as when he entered the hospital. Defendant further testified that he made certain that Krivanec was going to be seen within the week, asked him to get his medical records, and made a note that a copy of the records should be sent to Dr. Pascale. Defendant additionally testified that on the day of discharge, he called the St. Francis Cardiology Group and informed them of Krivanec's admission and told them that Krivanec needed to be seen in follow-up. He made no note in the chart that he called Dr. Pascale's office.

Dr. Mark Stern, defendant's cardiology expert, testified that the standard of care did not require defendant to recommend that Krivanec have an angiogram. Based upon Kirvanec's

history, testing, and examination, there was no evidence that Krivanec was at high risk for imminent cardiac mortality. There was nothing in the medical records from Christ Hospital to show that there was a shift in his coronary artery disease that made it unstable and there was nothing in the testing to indicate that his stable coronary artery condition had changed. Therefore, it was reasonable for defendant to inform Krivanec to follow up with his own cardiologist within a week and to get his medical records. More specifically, Dr. Stern testified that there was nothing to suggest that at the time, the left anterior descending artery had gotten to the point where it was 70% or 80% occluded based upon the stress test. In his opinion, the left anterior descending artery rupture was hours or minutes before his heart attack based upon his August angiogram. There is no way for a doctor to predict when a rupture may happen.

Dr. Stern acknowledged that if an angiogram had been done that showed the left anterior descending artery was occluded 70% or more, this would have put Krivanec at a greater risk for death than if his occlusion was less than 70%. The standard of care would then have required that Krivanec undergo either an angioplasty with a stent or a coronary artery bypass surgery. It was more probably true than not that it would have prevented the heart attack. He agreed that unstable angina means a change in the symptoms of angina and increases the risk for heart attack. Nevertheless, it was Stern's opinion that Krivanec's risk for a heart attack was an ongoing medical problem. He further acknowledged that if defendant thought his condition was unstable and at a significantly increased risk of having a further problem outside of the risks he was already having, then he should inform him of that risk. If defendant concluded that he needed an angiogram, then the standard of care would be to tell him that he needed an

1-05-1617

angiogram.

Defendant then renewed his motion for a directed verdict and the trial court again reserved its ruling on the motion. No ruling was issued before judgment was entered on the verdict. The jury returned a verdict in plaintiff's favor in the amount of $500,000 and the trial court entered judgment on the verdict. Thereafter, defendant filed a renewed motion for directed verdict and a posttrial motion seeking a judgment notwithstanding the verdict, a new trial, and, alternatively, a setoff of $241,091 based upon recoveries from other sources. The trial court denied defendant's renewed motion for a directed verdict and denied his posttrial motion for judgment notwithstanding the verdict or for a new trial, but allowed the requested setoffs and reduced the judgment amount to $258,929.

ANALYSIS

Defendant contends that the trial court erred in denying his renewed motion for a directed verdict and motion for judgment notwithstanding the verdict because plaintiff did not prove the proximate cause element of her case. Both motions for directed verdict and for judgment notwithstanding the verdict should only be granted when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors a movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 1967 .

A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a prima facie case. Sullivan v. Edward Hospital, 209 Ill. 2d 100, 123, 806 N.E.2d 645, 660 2004 . A plaintiff must present at least some evidence on every essential element of the cause

1-05-1617

*of action or the defendant is entitled to judgment in his or her favor as a matter of law.* Sullivan, 209 Ill. 2d at 123, 806 N.E.2d at 660. *If the plaintiff fails to produce a required element of proof in support of her cause of action, then no cause is presented for the jury's consideration and the entry of a directed verdict for the defendant is proper.* Sullivan, 209 Ill. 2d at 123, 806 N.E.2d at 660. *Accordingly, our review is* de novo. Sullivan, 209 Ill. 2d at 112, 806 N.E.2d at 653.

*The plaintiff must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury.* Borowski v. Von Solbrig, 60 Ill. 2d 418, 424, 328 N.E.2d 301, 305 1975 . *The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty.* Northern Trust Co. v. University of Chicago Hospitals Clinics, 355 Ill. App. 3d 230, 242, 821 N.E.2d 757, 768 2004 absent expert testimony that defendant's negligent acts caused the injuries within a reasonable degree of medical certainty, a verdict in plaintiff's favor cannot stand .

Defendant argues that the expert testimony, even when viewed in the light most favorable to plaintiff, failed to show that Krivanec would have obtained successful follow-up care if defendant had recommended it and that the follow-up care would have prevented his death. Plaintiff maintains that she need only show that defendant's negligence "proximately caused an increased risk of harm or lessened Krivanec's chance of recovery."

Plaintiff correctly notes that in Holton v. Memorial Hospital, 176 Ill. 2d 95, 107-08, 679 N.E.2d 1202, 1208 (1997), the supreme court reiterated that a plaintiff need not prove that a "better result" would have been achieved absent the alleged negligence of the doctor. Accordingly, in the present case, plaintiff was not required to prove that Krivanec's follow-up

- 10 -

care would have been ultimately successful. Rather, *to the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused an increased risk of harm or lost chance of recovery.* Holton, 176 Ill. 2d at 119, 679 N.E.2d at 1213. *Thus, the appropriate question here is whether plaintiff presented some expert testimony from which the jury could conclude that it was more probably true than not that defendant's negligence cost Krivanec a chance for a better result.*

*In order to answer that question, it is necessary to understand plaintiff's theory regarding defendant's deviation and its connection to her theory of proximate cause. There was some evidence adduced at trial that Krivanec presented in the hospital with an increased risk for a heart attack due to signs and symptoms of unstable angina, and that defendant deviated from the standard of care by failing to inform Krivanec of his abnormal stress test, by failing to inform him that he was at an increased risk for a heart attack, and by not advising him that he should have an angiogram to further evaluate his cardiac condition.*

*Based upon this testimony, as well as evidence suggesting that Krivanec thought his problem was an exacerbation of his asthma rather than his cardiac condition, an inference could then be made by the jury that had Krivanec been adequately informed and referred for an angiogram, he would have understood the gravity of the situation and sought an appointment with his doctor within the week as directed. See Haist v. Wu, 235 Ill. App. 3d 799, 821, 601 N.E.2d 927, 941 1992 where the decedent thought she suffered a miscarriage, and where the doctor failed to communicate that test results indicated an ectopic pregnancy, it was not unreasonable to infer that medical help might have been sought sooner had she been aware of the situation . There was further expert testimony that had Krivanec had an angiogram within the week, it would have revealed significant blockage in the artery or unstable plaque or both, and the standard*

of care would have required an angioplasty with a stent or coronary artery bypass surgery, either of which would have likely prevented the fatal heart attack in August 1998.

Despite this testimony, there is a fatal gap in the evidence to support plaintiff's proximate cause analysis. Plaintiff argues that she has met her burden of proof by establishing that defendant's negligence "deprived [Krivanec's] doctors of an opportunity to properly diagnose his condition, and that had they been given an opportunity, there was treatment that would have prevented his fatal heart attack." Nevertheless, plaintiff failed to establish that Krivanec indeed lost an opportunity for diagnosis and treatment where he was seen and treated by Dr. Pascale prior to his heart attack, and failed to establish that defendant's negligence cost him a chance for a better result.

For example, in Holton, the defendant's negligence deprived the plaintiff's physicians of an opportunity to correctly diagnose and treat her condition, and cost the plaintiff a chance for recovery. Holton, 176 Ill. 2d at 110, 679 N.E.2d at 1209. There, the plaintiff became paralyzed as a result of the failure to timely diagnose and treat pressure on her spinal cord caused by a fractured vertebra. Holton, 176 Ill. 2d at 99-103, 679 N.E.2d at 1204-06. The supreme court held that the plaintiff established proximate cause where there was evidence that had the treating doctors been given an opportunity to properly diagnose the plaintiff's condition based on accurate and complete information from the hospital staff, they would have had the opportunity to treat her condition by ordering the appropriate treatment. Because the hospital staff negligently failed to accurately and timely report the plaintiff's symptoms to the treating doctors, the appropriate treatment could not even be considered. Holton, 176 Ill. 2d at 108, 679 N.E.2d at 1208.

Here, in contrast, there was no evidence adduced at trial from which the jury could find that

1-05-1617

defendant's negligence deprived Dr. Pascale of an opportunity to properly diagnose and treat Krivanec. It was undisputed that Krivanec saw his treating doctor, Dr. Pascale, several weeks after his hospitalization, but prior to his heart attack in August of 1998. As articulated by Dr. McDonough, and unlike Holton, defendant's negligence was predicated on his failure to provide vital information to the patient, which caused him to delay seeking care, not on his failure to communicate information to Dr. Pascale. There was no evidence to suggest that Dr. Pascale lacked the necessary information to make an informed diagnosis and to treat the patient accordingly at the July visit. That assumption would be mere speculation. The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible. Susnis v. Radfar, 317 Ill. App. 3d 817, 827, 739 N.e.2d 960, 967 2000 . Indeed, the only evidence presented on that issue was that plaintiff went with Krivenac to Christ Hospital to obtain his medical records shortly after his discharge and that defendant made a note that a copy of the records should be sent to Dr. Pascale.

Furthermore, unlike Holton, plaintiff did not establish that any negligence cost Krivanec a chance for a better result. There was no evidence that, between the time Krivanec was discharged and the time he saw Dr. Pascale prior to his heart attack, his condition had changed such that the deviation increased Krivanec's risk of harm or lessened his chance for recovery or survival. There was no expert testimony that had Krivanec had an angiogram and further treatment when he went to see Dr. Pascale, as the standard of care would have required, the treatment would have been less effective in preventing Krivanec's fatal heart attack than had he had the angiogram and bypass surgery within the week of his discharge. Thus, unlike Holton, the evidence here does not permit the inference that defendant's negligence prevented Krivanec's physician from correctly diagnosing and treating his condition. Nor does it permit an inference

- 13 -

that any delay in seeking diagnosis and treatment between the week after discharge and the time he saw Dr. Pascale would have caused any increased risk of harm or lessened his chance of survival.

Additionally distinguishable is plaintiff's cited case of Cohan v. Garretson, 282 Ill. App. 3d 248, 667 N.E.2d 1325 1996 . In Cohan, there was evidence that earlier treatment of the plaintiff's heart condition would have prevented the plaintiff from being subjected to an emergency surgery and a resulting dropped foot. The lost opportunity cost him a chance for a better result.

In contrast, here, plaintiff failed to establish through expert testimony that earlier treatment within the week or so after discharge would have prevented a harm that would have likely occurred by delaying several weeks in seeing Dr. Pascale. The only evidence adduced was that the standard of care required the same diagnostic testing and treatment within the week of his discharge as when he presented to Dr. Pascale. Thus, plaintiff failed to establish a *prima facie* case that defendant's negligence cost plaintiff a chance for a better result.

Given the complete absence of expert testimony connecting defendant's deviation from the standard of care with Krivanec's fatal injury, the evidence of proximate cause was insufficient to submit to a jury. Thus, we are compelled to conclude that the evidence so overwhelmingly favored defendant that no contrary verdict based on the evidence could ever stand and that a directed verdict is proper. Accordingly, we need not address defendant's additional contentions and reverse the judgment of the circuit court.

Reversed.

KARNEZIS and ERICKSON, JJ., concur.

SANDRA KRIVANEC, as Special Administratrix
of the Estate of GEORGE KRIVANEC, Deceased,

Plaintiff-Appellee,

v.

BRUCE M. ABRAMOWITZ, M.D.,

Defendant-Appellant.

No. 1-05-1617

Appellate Court of Illinois
First District, Third Division

Filed: June 14, 2006

JUSTICE THEIS delivered the opinion of the court.

Karnezis and Erickson, JJ., concur.

Appeal from the Circuit Court of Cook County
Honorable Robert E. Gordon, Judge Presiding

For APPELLANT       David E. Neumeister
Jennifer L. Medenwald
Roger Littman
Querrey & Harrow, LTD.
175 W. Jackson Blvd., Suite 1600
Chicago, IL 60604

For APPELLEE       Lawrence R. Kream
Sharon K. O'Connell
David J. DeJong & Associates, LTD.
20 N. Clark St., Suite 2700
Chicago, IL 60602