SIXTH DIVISION
May 25, 2007

Nos. 1-06-1707 & 1-06-1814 cons.

| | | |
|---|---|---|
| BETTY KUNZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| Separate-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | Nos. 02 L 004839 |
| LITTLE COMPANY OF MARY HOSPITAL AND | ) | |
| HEALTH CARE CENTERS, ) | | |
| | ) | |
| Defendant-Appellee, | ) | |
| Separate-Appellant | ) | |
| | ) | The Honorable |
| | ) | Mary A. Mulhern, |
| | ) | Judge Presiding. |
| (Manor Care Health Services, Inc., Jue-Lin | ) | |
| Tang and Metro Infectious Disease | ) | |
| Consultants, L.L.C., | ) | |
| | ) | |
| Defendants). | ) | |

<u>Modified Upon Denial of Rehearing</u>

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

In this medical malpractice case, plaintiff Betty Kunz appeals the judgment on the jury's verdict in her favor of $3,200,000 arguing that the circuit court erred by failing to admit her expert's testimony regarding damages and failing to give the jury her proffered jury instructions regarding damages; defendant Little Company of Mary Hospital and Health Care Centers (LCMH) cross-appeals, arguing that the circuit erred by failing to grant its motion for judgment *n.o.v.* and that it is entitled to a new trial. These appeals have been consolidated. We affirm in part, reverse in part and remand for further proceedings regarding past and future medical expenses only.

Nos. 1-06-1707 & 1-06-1814 cons.

On June 7, 2000, plaintiff, age 75 at the time, was admitted to LCMH for possible further right knee surgery and evaluation of an infection. Plaintiff's infection had developed following total right knee replacement surgery two weeks before. Plaintiff had developed a methicillin-resistent staff aureus (MRSA) infection (a type of staph infection that is resistant to most antibiotics) in her right knee. An infectious disease specialist, Dr. David Beezhold, initially prescribed three antibiotics to treat plaintiff: vancomycin, rifampin, and gentamicin. The gentamicin was to be a short-course treatment because of the drug's potentially harmful effects on the kidneys. Dr. Beezhold ordered a creatinine test which showed that plaintiff's kidneys were functioning within normal limits. Dr. Beezhold's plan for gentamicin was to be discontinued prior to plaintiff's discharge from LCMH. His orders read, "Okay for discharge on IV vancomycin/P.O. [orally] rifampin from infectious disease standpoint."

Plaintiff was discharged on June 10, 2000, at about 9 p.m. to Manor Care nursing home accompanied by a LCMH patient transfer form, a history, a physical exam report, and some lab reports of plaintiff. Contrary to Dr. Beezhold's plan, the transfer form listed "gentamicin 120 milligrams, IV piggyback every 12 hours, next dose, 9:00 p.m. today, 6/10." The transfer form also identified Dr. Beezhold as plaintiff's infectious disease physician, included his phone number, and in accordance with Dr. Russell Petrak's telephone discharge order, requested that Manor Care call Dr. Beezhold on June 12 to set up an appointment.

LCMH nurse Halina Ciezkowski testified that she drafted the portion of plaintiff's transfer form that listed the various medications including the gentamicin. She spoke with Dr. Petrak on the telephone on June 10, 2000, to obtain discharge orders for plaintiff. Doctor Petrak was Dr.

2

Beezhold's infectious disease partner and was contacted because Dr. Beezhold was on vacation. Although nurse Ciezkowski could not remember the particular conversation with Dr. Petrak, she testified that the custom and practice would have been for Dr. Petrak to ask her for the information contained in the patient's chart. She would convey the information contained in the chart to Dr. Petrak. She then would have written the order exactly as Dr. Petrak gave it to her and would have read it back to him for verification. Nurse Ciezkowski knew that Manor Care would been guided by the transfer form.

Cheryl Vajdik, R.N., plaintiff's nursing expert, and nurse Noreen Buchtal, Manor Care's director of nursing, testified that they would expect a reasonably well-qualified nurse to know that gentamicin is a nephrotoxic drug, that is, it can be damaging to the kidneys. Nurse Vajdik testified that nurse Ciezkowski deviated from the standard of care by listing gentamicin on plaintiff's patient transfer form because Dr. Beezhold's plan did not call for it. She further stated that if nurse Ciezkowski told Dr. Petrak that Dr. Beezhold's plan called for plaintiff to be placed on gentamicin, that was also a deviation from the standard of care. Nurse Buchthal testified that the transfer form provides a "continuity of care" between the hospital and the nursing home. She has never seen a medication listed on a transfer form that had previously been discontinued at the hospital before transfer.

Manor Care nursing home nurse Donna Van Gampler testified that she relied on the medications listed on the transfer form to prepare her own physician order form for medications to be given to plaintiff. Based on the transfer form, she believed plaintiff was to receive gentamicin without any discontinuation.

3

Nos. 1-06-1707 & 1-06-1814 cons.

Dr. Russell Petrak testified that, contrary to Dr. Beezhold's plan, the transfer order stated that plaintiff was to be discharged to Manor Care on IV vancomycin and gentamicin. Dr. Petrak testified that he could not specifically recall the conversation he had with nurse Ciezkowski on the telephone on June 10, 2000, regarding plaintiff but that it was his custom and practice to have the nurse convey to him over the telephone the plan put into the chart by his partner. He relied on nurses to provide him with accurate information from the chart. Dr. Petrak wanted to follow Dr. Beezhold's plan because Dr. Beezhold was familiar with plaintiff's course of treatment and condition. However, the discharge order calling for continued treatment with gentamicin did not match Dr. Beezhold's plan, which called for a discontinuation of gentamicin. Dr. Petrak testified that he would only have ordered gentamicin for plaintiff if he had been told over the phone that gentamicin was a part of Dr. Beezhold's plan. He stated that he must have been "misinformed."

Dr. Petrak testified that Manor Care nursing home was dependent on getting accurate information from LCMH as to what care plaintiff should get after she was transferred. Based on the way transfer forms are used, Dr. Petrak testified that he would expect the Manor Care staff to continue to give plaintiff gentamicin based on the transfer form prepared by nurse Ciezkowski.

Dr. Jue-Lin Tang, the attending physician at Manor Care nursing home, testified that he received his first call regarding plaintiff on the night she was transferred on June 10, 2000, at about 11 p.m. Dr. Tang testified that the transfer form's purpose is "to give the doctor in the nursing home a guidance how to continue treating the patients" but it does not, itself, authorize treatment. The transfer form provided the only information on how to treat plaintiff. Dr. Tang testified that it was up to him to determine whether the medications listed on the transfer form

4

were reasonable and should be continued while the patient was at Manor Care. Because the medications listed on plaintiff's transfer form were initially prescribed at the hospital she was transferred from and appeared reasonable, he prescribed the same medication to her, including gentamicin, on June 11, 2000. Dr. Tang interpreted the transfer form as calling for continued treatment with gentamicin and he relied on the transfer form and prescribed IV gentamicin to plaintiff when she arrived. Plaintiff continued to receive gentamicin until the afternoon of June 14, 2000. Dr. Tang did not order blood tests to check plaintiff's kidneys for two days, did not see plaintiff for three days, and did not contact Dr. Beezhold or Dr. Petrak for three days. Manor Care nursing home did not typically order daily blood tests to check kidney function unless the patient had some known prior history of kidney problems.

Dr. Tang testified that on the morning of June 13, 2000, he was told that plaintiff was having trouble urinating. Dr. Tang examined plaintiff but did not stop the gentamicin because he was concerned about plaintiff's infection; he ordered a creatinine test. Plaintiff continued to receive gentamicin that day and the next day even though plaintiff continued to have trouble urinating and her bladder was distended. On June 14, 2000, plaintiff's creatinine test came back abnormally high. Dr. Tang gave an order for another creatinine test but did not stop the gentamicin. The following day showed an even higher creatinine level and Dr. Tang then ordered the gentamicin stopped. That day, June 15, 2000, Dr. Tang diagnosed plaintiff with acute renal failure (a sudden decrease in kidney function). Although plaintiff reported having trouble urinating, Dr. Tang did not stop the gentamicin earlier because he was concerned about plaintiff's MRSA infection, the diagnosis contained on the transfer form, and the possibility that the MRSA

infection may cause plaintiff to lose a limb or her life. He relied on the fact that, according to the transfer form, plaintiff had been prescribed gentamicin and had been discharged from LCMH while still being administered gentamicin. Dr. Tang believed that LCMH transferred a stable patient to his care and that a plan had been put in place which included gentamicin.

Plaintiff's kidney expert, Dr. Vincent Pateras, testified that as a result of this prolonged treatment of gentamicin, plaintiff suffered permanent kidney failure and would require dialysis for the rest of her life.

Dr. Keith Armitage, an expert in internal medicine and infectious diseases, testified that if nurse Ciezkowski failed to accurately communicate Dr. Beezhold's plan to Dr. Petrak, she fell below the standard of care for nurse-physician communications. Dr. Armitage corroborated Dr. Pateras' opinion, testifying that plaintiff suffered from permanent kidney failure and would require dialysis for the rest of her life. He further testified that each dose of gentamicin had cumulative effects and that each dose harmed plaintiff, stating: " Each dose in a case like this causes renal failure. Then as you continue to give the drug, you get higher and higher levels in your system and that makes the renal failure worse."

Plaintiff's MRSA infection resolved favorably and she returned to living at home, but she now has permanent kidney damage and requires dialysis three times a week for the remainder of her life.

The only defendant found liable was LCMH based on nurse Ciezkowski's negligently informing Dr. Petrak that the long-term antibiotic plan of Dr. Beezhold included gentamicin and then included gentamicin on the medication portion of the patient transfer form that accompanied

6

plaintiff from LCMH to Manor Care. The jury did not find Dr. Tang negligent. The jury awarded plaintiff $3,200,000.

In its cross-appeal, LCMH argues that the trial court erred by denying its motion for judgment *n.o.v.* because plaintiff failed to prove that nurse Ciezkowski was the proximate cause of plaintiff's injuries.

"[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967). In other words, directed verdicts or a judgment *n.o.v.* should not be granted if "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178 (2006), quoting Pasquale v. Speed Products Engineering, 166 Ill. 2d 337, 351 (1995). In making this determination, a reviewing court must not substitute its judgment for the jury's, and may not reweigh the evidence or determine the credibility of witnesses. Moller v. Lipov, 368 Ill. App. 3d 333, 341-42 (2006). As in other negligence cases, the question of whether a healthcare worker's conduct was a proximate cause of the plaintiff's injury is a question of fact for the jury. Mansmith v. Hameeduddin, 369 Ill. App. 3d 417, 425 (2006). Our review of this issue is *de novo.* Mansmith, 369 Ill. App. 3d at 426.

To establish proximate cause, a plaintiff must prove both "cause in fact" and "legal cause." Young v. Bryco Arms, 213 Ill. 2d 433, 446-47 (2004). "Cause in fact exists where there is reasonable certainty that a defendant's acts caused the injury or damage. [Citation.] Legal cause,

by contrast, is essentially a question of foreseeability. [Citation.] Proximate cause is not established, however, where the causal connection is 'contingent, speculative, or merely possible.' [Citations.]" Mengelson v. Ingalls Health Ventures, 323 Ill. App. 3d 69, 75 (2001).

LCMH contends that plaintiff failed to prove that nurse Ciezkowski's misreading of Dr. Beezhold's plan to Dr. Petrak was the cause in fact of plaintiff's injury. LCMH argues that this was never established with reasonable certainty.

Defendant fails to recognize that " 'reasonable certainty' need not be shown by direct evidence; rather, it may be established by inference from circumstantial evidence." Mann v. Producer's Chemical Co., 356 Ill. App. 3d 967, 974 (2005). The circumstantial evidence does not need to exclude all other possible inferences or support only one logical conclusion; rather, liability may be established when the facts and circumstances, in the light of ordinary experience, reasonably suggest that the defendant's negligence produced the injury. Mann, 356 Ill. App. 3d at 974.

In this case, it was undisputed that Dr. Beezhold, plaintiff's infectious disease specialist, did not want plaintiff to receive gentamicin after discharge. However, gentamicin was included on plaintiff's transfer form prepared by nurse Ciezkowski. Although she prepared it after a conversation and at the direction of Dr. Petrak, Dr. Petrak testified that as a matter of custom and practice he gave orders after a nurse read Dr. Beezhold's previous orders. If he ordered gentamicin, it was because he had been "misinformed." Nurse Ciezkowski's testimony did not contradict Dr. Petrak's testimony. She testified that as a matter of custom and practice, she would read the patient's information to Dr. Petrak over the phone and then write down his orders.

8

Here, given this circumstantial evidence, a reasonable juror could have found with reasonable certainty that, but for nurse Ciezkowski's misinforming Dr. Petrak, plaintiff would not have been prescribed gentamicin while at Manor Care and would not have suffered kidney damage as a result.

LCMH cites Mann v. Producer's Chemical Co., 356 Ill. App. 3d 967 (2005), and Gyllin v. College Craft Enerprises, Ltd., 260 Ill. App. 3d 707 (1994), to support its position. However, these cases are factually distinguishable from the case at bar. In Mann, the defendant argued that the plaintiff crossed the street only after a truck driver waived him across. However, there was no evidence supporting that theory. In contrast to Mann, in this case, there is ample evidence to support the theory that nurse Ciezkowski incorrectly read Dr. Beezhold's previous order to Dr. Petrak or incorrectly transcribed Dr. Petrak's subsequent order. Unlike Mann, plaintiff in this case produced evidence which, if believed by a reasonable jury, proved that an incorrect entry in plaintiff's patient transfer form caused plaintiff's injury. Nurse Ciezkowski admitted as a matter of custom and practice to writing this entry and Dr. Petrak testified that he would not have ordered gentamicin in the absence of nurse Ciezkowski telling him that Dr. Beezhold's most recent plan called for the drug. Further, the jury found Dr. Tang not liable for plaintiff's injury. Therefore, Mann is not controlling here.

Similarly, in Gyllin, the plaintiff produced no evidence to support her theory of causation and no facts were in dispute. In this case, plaintiff presented ample evidence for the jury to find that nurse Ciezkowski was the cause in fact of plaintiff's injuries.

LCMH also contends that plaintiff failed to prove that it was the legal cause of her injuries

9

Nos. 1-06-1707 & 1-06-1814 cons.

because plaintiff proved only that nurse Ciezkowski furnished merely a condition for the injury which was caused by the subsequent, independent act of a third person--Dr. Tang. LCMH notes that plaintiff's own expert witness testified that Dr. Tang caused plaintiff's injuries by failing to monitor plaintiff's kidney function, failing to contact Dr. Beezhold or Dr. Petrak, and failing to stop the gentamicin at the first sign of urinary problems.

We are reminded that a defendant may be held liable if the defendant's conduct contributed in whole or in part to the injury. Elliott v. Williams, 347 Ill. App. 3d 109, 113 (2004). In this case, there is ample evidence that nurse Ciezkowski's negligence was a legal cause of plaintiff's kidney damage and that Dr. Tang's conduct was foreseeable under the circumstances. "The proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." Young, 213 Ill. 2d. at 446-47. Regarding a third-party's acts, the subsequent act of a third-party does not break the causal connection between a defendant's negligence and a plaintiff's injury if the subsequent act was probable and foreseeable. Roeseke v. Pryor, 152 Ill. App. 3d 771, 779 (1987). To avoid liability, a defendant must show that the third-party's act was unforeseeable as a matter of law. Roeseke, 152 Ill. App. 3d at 779.

LMCH ignores the fact that there was contradicting testimony from Dr. Tang's expert, who testified that none of these "failures" caused plaintiff's injuries. Apparently the jury, who was charged with weighing the evidence and resolving any conflicts in testimony, found that Dr. Tang was free from negligence and was free to believe Dr. Tang's expert witness. The same jury determined that nurse Ciezkowski was the sole cause of plaintiff's injury. In making this

10

determination, we must not substitute our judgment for the jury's, and may not reweigh the evidence or determine the credibility of witnesses. Moller, 368 Ill. App. 3d at 341-42.

Further, the testimony established that a transfer form that accompanies a patient to a nursing home is a guide for continuing treatment. Dr. Petrak testified that he would expect the doctors at the nursing home to continue administering gentamicin based on the transfer form that accompanied plaintiff. Dr. Tang testified that the purpose of the transfer form was to "give the doctor in the nursing home guidance on how to continue treatment treating the patients." The director of nursing at Manor Care nursing home testified that the transfer form is used to provide continuity of care between the hospital and the nursing home. Dr. Tang gave a reasonable explanation as to why he did not discontinue gentamicin when plaintiff began experiencing urinary problems; he stated that he was afraid that plaintiff might lose her life or a limb because of the MRSA infection. Dr. Tang eventually did take plaintiff off gentamicin after performing another kidney function test. After reviewing this record, we believe that the jury properly determined that the actions of Dr. Tang were foreseeable and that the jury's determination that nurse Ciezkowski was the sole cause of plaintiff's injury must stand. The fact that reasonable minds might differ is not enough to change a jury's verdict. See York, 222 Ill. 2d at 178.

Defendant cites Jinkins v. Evangelical Hospitals Corp., 336 Ill. App. 3d 377 (2002), and Krivanec v. Abramowitz, 366 Ill. App. 3d 350 (2006), to support its argument that plaintiff's injury was not foreseeable to nurse Ciezkowski. These cases are factually distinguishable from the case at bar. In Jinkins, the appellate court affirmed summary judgment in favor of a medical facility that transferred a suicidal patient to a state psychiatric facility which had released the

11

patient a short time after evaluating him. Jinkins, 366 Ill. App. 3d at 384. One hour after the patient's release from the defendant medical facility, he killed himself. Jinkins, 366 Ill. App. 3d at 381. The appellate court held that it was not foreseeable to the medical facility that the patient would kill himself after being admitted to the psychiatric facility because, in part, the medical facility informed the psychiatric facility of the patient's history, including psychosis. Jinkins, 366 Ill. App. 3d at 384. In contrast, nurse Ciezkowski failed to correctly inform Manor Care nursing home of plaintiff's history. The patient transfer form did not contain a correct list of medications that plaintiff was to be given at Manor Care nursing home. Therefore, Jinkins is distinguishable from the case at bar.

Krivanec is also factually distinguishable from the case at bar. In Kravinec, the defendant doctor failed to perform a stress test and failed to tell the patient that he needed an angiogram within the week. Krivanec, 366 Ill. App. 3d at 351. About two months later, the patient saw his cardiologist, who changed the patient's medication but failed to perform an angiogram. Krivanec, 366 Ill. App. 3d at 351. The patient's estate argued that the defendant doctor's negligence denied the patient of chance to have his condition properly diagnosed and treated earlier, preventing his fatal heart attack. Krivanec, 366 Ill. App. 3d at 351-52. The appellate court held that the patient was not denied an opportunity to be diagnosed and treated because he saw his cardiologist before his fatal heart attack and the defendant doctor did nothing to prevent the cardiologist from correctly diagnosing and treating the patient. Krivanec, 366 Ill. App. 3d at 359. In contrast, the evidence in this case supports the jury's finding that nurse Ciezkowski did something that prevented Dr. Tang from treating plaintiff effectively; that is, she told Dr. Petrak that Dr.

12

Nos. 1-06-1707 & 1-06-1814 cons.

Beezhold's plan was for plaintiff to continue taking gentamicin while at Manor Care nursing home. Nurse Ciezkowski's inclusion of gentamicin on the patient transfer form led to the administration of gentamicin to plaintiff, which directly led to plaintiff's injury. Thus, Krivanec is not controlling in this case.

In the alternative, LCMH urges this court to grant a new trial, contending that the evidence was against the manifest weight of the evidence. See Knauerhaze v. Nelson, 361 Ill. App. 3d 538, 557 (2005). Because we believe there was ample evidence for the jury's verdict for the reasons stated above, we do not believe LCMH is entitled to a new trial.

In her appeal, plaintiff argues that the trial court barred the expert testimony of Dr. Peteras regarding plaintiff's unpaid past and future medical bills. LCMH argues that plaintiff failed to lay a proper foundation for her expert, Dr. Peteras, and therefore, the circuit court did not abuse its discretion.

Generally, expert testimony is not admitted when the subject matter is not beyond the knowledge and experience of the average juror. Binge v. J.J. Borders Construction Co., 95 Ill. App. 3d 238, 242 (1981). But, expert testimony will be admitted if the expert has some experience and knowledge that is not common to laypersons and his testimony will be of aid to the jury. Thompson v. Gordon, 221 Ill. 2d 414, 428 (2006). There is no predetermined formula for how an expert acquires specialized knowledge or experience; the expert may gain such through practical experience, scientific study, education, training or research. Thompson, 221 Ill. 2d at 428-29. "An expert need only have knowledge and experience beyond that of an average citizen." Thompson, 221 Ill. 2d at 429. Accordingly, expert testimony is admissible "if the

13

Nos. 1-06-1707 & 1-06-1814 cons.

proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." Snelson v. Kamm, 204 Ill. 2d 1, 24 (2003).

We may not disturb a circuit court's decision on whether to exclude an expert witness' testimony absent an abuse of discretion. Thompson, 221 Ill. 2d at 428. An abuse of discretion occurs when the circuit court's ruling is arbitrary, fanciful or unreasonable, or when no reasonable person would take the same view, or if the circuit court applies impermissible criteria. Agnew v. Shaw, 355 Ill. App. 3d 981, 990 (2005).

To introduce an unpaid bill into evidence, a party must establish that the bill is reasonable for the services of the nature provided. Arthur v. Catour, 216 Ill. 2d 72, 82-83 (2005). A party seeking admission of an unpaid bill into evidence "can establish reasonableness by introducing the testimony of a person having knowledge of the services rendered and the usual and customary charges for such services." Arthur, 216 Ill. 2d at 82, quoting Baker v. Hutson, 333 Ill. App. 3d 486, 493 (2002). This includes establishing that the charges are usual and customary charges for services in a similar geographic area in which the services were provided. See, *e.g.*, Tsai v. Kaniok, 185 Ill. App. 3d 602, 604-05 (1989).

LCMH cites numerous cases for the proposition that plaintiff must also establish that Dr. Peteras was familiar with the billing practices of each provider. However, the cases cited by LCMH are contract cases wherein the parties are concerned with receiving the benefit of their bargain. This requires knowing the initial offer and acceptance figure. Whereas, in this case and cases like it--tort cases--we are concerned with making the victim whole by making the tortfeasor

14

pay reasonable medical expenses, both past and future. Therefore, knowing the billing practices of each provider is not what is sought; rather, it is the reasonableness of the fees that is relevant.

In this case, Dr. Peteras' testimony on the subject was beyond the ken of the average juror and was of aid to the jury. Most people would not know the usual and customary charges of plaintiff's medical bills in the Chicago area. Doctor Peteras testified that he was a licensed physician in Illinois and board-certified in nephrology. He was on the faculty at the Northwestern University School of Medicine-Feinberg School of Medicine and taught medical students at Evanston Hospital. Dr. Peteras had been the director of the dialysis unit at Evanston Hospital for over 20 years. During his 40-year career as a practicing nephrologist, Dr. Peteras had been involved with dialysis facilities and he was familiar with the operation of dialysis centers and facilities. Dr. Peteras testified that he was familiar with "the reasons why dialysis charges are charged the way they are" and explained why dialysis is so expensive. Dr. Peteras testified that he reviewed plaintiff's bills and that they were reasonable, customary and necessary. Further, he stated that plaintiff's charges were necessitated by defendant's negligence, that she had a life expectancy of 9.1 years, and that she would incur a cost of $250,000 a year in medical treatment due to her injury. Doctor Peteras testified that he was familiar with the customary, reasonable and necessary charges for dialysis in the Chicago area. The fact that most of plaintiff's unpaid past bills were incurred in Crestwood is of no significance because Crestwood is in the same geographic area as Evanston; that is, the Chicagoland area. Likewise, the fact that Dr. Peteras was not familiar with plaintiff's provider's billing process could have been raised during cross-examination and weighed by the jury. But the fact remains that Dr. Peteras possessed knowledge

beyond that of a layperson and his testimony could have aided the jury. The question of damages is peculiarly one of fact for the jury. <u>Baker</u>, 333 Ill. App. 3d at 493. Therefore, we find that the trial court erred by failing to admit Dr. Peteras' opinion testimony regarding past and future medical expenses and the unpaid medical bills into evidence. Accordingly, we remand for a new trial on the issue of past and future medical damages only.

Because we have decided to remand this case for a new trial on past and future medical damages we need not address plaintiff's argument that the trial court erred by failing to give her proffered instructions on damages.

Affirmed in part and reversed in part; cause remanded for further proceedings regarding past and future medical expenses only.

McNULTY and O'MALLEY, JJ., concur.