**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220221-U

Order filed November 8, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| DIJANA RIS, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE HEALTH AND HOSPITALS | ) | |
| CORPORATION d/b/a ADVOCATE GOOD | ) | Appeal No. 3-22-0221 |
| SAMARITAN HOSPITAL, a corporation; LI | ) | Circuit No. 16-L-613 |
| ZHANG, M.D., S.C., a corporation; and LI | ) | |
| ZHANG, M.D., | ) | |
| | ) | |
| Defendants | ) | The Honorable |
| | ) | David E. Schwartz, |
| (Li Zhang, M.D., Defendant-Appellant). | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Trial court properly dismissed physician's motion to dismiss patient's 2016 medical malpractice action on statute of repose grounds where physician continuously treated patient until 2014; (2) trial court did not abuse its discretion in allowing experts to testify about the standards of care in their respective fields; (3) trial court did not abuse its discretion in overruling physician's objections during plaintiff's closing arguments; (4) trial court did not abuse its discretion in allowing hospital defendant's special interrogatories or failing to order a new trial

based on the jury's answers to them; and (5) trial court did not abuse its discretion in allowing testimony from neurologist about the cost of 24-hour attendant care for plaintiff.

¶ 2 Plaintiff Dijana Ris filed a medical malpractice complaint against defendant Dr. Li Zhang, Zhang's medical corporation and defendant Advocate Health and Hospitals Corp (Advocate), d/b/a Advocate Good Samaritan Hospital (Good Samaritan). During trial, the court entered an order voluntarily dismissing Dr. Zhang's medical corporation as a defendant. Following trial, the jury found Dr. Zhang liable and Advocate not liable and entered judgment against Dr. Zhang for $3,350,000. Dr. Zhang appeals, arguing that the trial court erred in (1) denying her motion to dismiss plaintiff's complaint, (2) allowing plaintiff's experts to testify about the standards of care in their respective fields, (3) overruling her objection to plaintiff's comments during closing argument, (4) allowing Advocate's special interrogatories and failing to order a new trial based on the jury's answers to them, and (5) allowing plaintiff's neurology expert to testify about the reasonable expense of necessary services for plaintiff in the future. We affirm.

¶ 3             BACKGROUND

¶ 4 On August 25, 2009, plaintiff Dijana Ris went to the emergency room of Good Samaritan complaining of severe headaches. She was admitted to the hospital and seen by Dr. Steven Beltran, an internal medicine physician. Dr. Beltran ordered testing, including magnetic resonance imaging (MRI) of plaintiff's brain. According to the MRI report, completed by Dr. James Scheuer, an "abnormal signal" or "mass" was present in the right anterior frontal lobe of plaintiff's brain, which could possibly be a "nonenhancing slow-growing glioma." A glioma is a brain tumor.

¶ 5 Dr. Beltran sought a consultation from defendant Dr. Li Zhang, a neurologist. Dr. Zhang performed a neurological exam of plaintiff and reviewed plaintiff's MRI. Dr. Zhang determined that the "abnormal signal" or "mass" identified in the MRI was most likely not a tumor but scar

2

tissue from an old head injury. Dr. Zhang instructed plaintiff to follow up with her for a repeat MRI in three months.

¶ 6 A second MRI of plaintiff was performed in December 2009. Dr. Siddiqi, the radiologist who interpreted the MRI, recommended that "if no intervention is planned at this time, a follow up should be obtained in six months to exclude a low-grade glioma." Dr. Zhang did not order any intervention, such as a biopsy, or a follow-up MRI.

¶ 7 Plaintiff did not have another MRI until July 2014, after she hit her head at work. Dr. Siddiqi interpreted that MRI and found "diffuse abnormality" throughout plaintiff's brain. He determined that the abnormal signal in plaintiff's brain "has significantly progressed since December 2009 where it was localized to the right frontal lobe." Because of the presence of tumors throughout plaintiff's brain, the only treatment option was whole-brain radiation. Plaintiff underwent five weeks of whole-brain radiation in 2014.

¶ 8 In July 2016, plaintiff filed a complaint against Dr. Zhang, her medical corporation and Advocate. Plaintiff alleged medical negligence and lack of informed consent. Plaintiff alleged that Dr. Zhang, as an actual or apparent agent of Advocate, "engaged in an ongoing and continuous course of negligent treatment" from August 26, 2009, to January 16, 2014, by failing to: (1) appreciate the significance of the abnormal findings on her 2009 MRIs, (2) order follow-up imaging after December 2009, (3) order appropriate diagnostic testing, (4) order a biopsy, (5) diagnose and treat her for glioma, and (6) refer her to a neurosurgeon.

¶ 9 Dr. Zhang and her corporation filed a motion to dismiss, alleging that plaintiff's complaint was barred by the four-year statute of repose. The trial court denied the motion, finding that plaintiff adequately alleged that Dr. Zhang participated in a continuing course of negligent treatment until 2014.

3

¶ 10    Prior to trial, Dr. Zhang filed a motion *in limine* seeking to bar the testimony of Dr. Steven Arkin, a neurologist, regarding the cost of future care and services for plaintiff. The trial court denied the motion. A jury trial was held over 10 days in June 2021.

¶ 11    Dr. Zhang testified that after first seeing plaintiff at Good Samaritan in August 2009, she next saw plaintiff at her private neurology practice on January 5, 2010, following plaintiff's December 2009 MRI. Dr. Zhang said, based on her custom and practice, she would have reviewed the MRI and report with plaintiff, but Dr. Zhang did not remember the conversation she had with plaintiff. Dr. Zhang testified that plaintiff's second MRI "reassured" her that the abnormal findings were consistent with a prior head injury and not a tumor.

¶ 12    Dr. Zhang agreed she was not employing a "watchful waiting" strategy with plaintiff. If she had been, she would have obtained additional MRIs. Dr. Zhang saw plaintiff in her office in Lisle several times a year until early 2014. During that time, Dr. Zhang treated plaintiff with medication for migraines. Dr. Zhang testified that she "never thought [plaintiff] had glioma." Dr. Zhang testified that if she suspected plaintiff had glioma, she would have referred her to a neurosurgeon. Dr. Zhang agreed that the standard of care required her to refer a patient with suspected glioma to a neurosurgeon.

¶ 13    At trial, plaintiff presented the testimony of three experts: Dr. Steven Arkin, a neurologist; Dr. Manesh Aghi, a neurosurgeon; and Dr. Tracy Batchelor, a neuro-oncologist. All three agreed that plaintiff's August and December 2009 MRIs showed a brain tumor that was confined to plaintiff's right frontal lobe. All three experts also agreed that if Dr. Zhang had identified and treated the tumor in a timely manner, it would not have spread outside of plaintiff's right frontal lobe, and whole-brain radiation, which caused plaintiff neurocognitive deficits, would have been unnecessary.

4

¶ 14        Dr. Arkin testified that Dr. Zhang deviated from the standard of care by failing to (1) recognize the possible existence of a tumor; (2) discuss with plaintiff the differential diagnosis contained in the 2009 MRI reports; (3) refer plaintiff to a neurosurgeon from 2009 to 2014; and/or (4) perform "serial surveillance on the lesion." Dr. Arkin opined that Dr. Zhang's failure to properly diagnose and treat plaintiff allowed plaintiff's tumor to grow outside the right frontal lobe and into other areas of plaintiff's brain.

¶ 15        Dr. Arkin testified that in his practice as a radiologist he has treated patients with brain injuries for over 28 years and regularly determines whether patients require assistance in daily activities. He further opined, over Dr. Zhang's objection, that plaintiff requires assistance with activities of daily living to "keep her out of danger." Dr. Arkin determined that plaintiff needs 24-hour assistance and supervision and asked plaintiff's counsel to provide him with hourly rates for agencies in the area where plaintiff lives that provide such care. Plaintiff's counsel provided Dr. Arkin with rates from two agencies: Assisting Hands, which charges $24.50 per hour, and Visiting Angels, which charges $25 per hour. Over Dr. Zhang's objection, Dr. Arkin testified that the hourly rates charged by those agencies were consistent with what agencies charge in the area where he lives. Dr. Arkin concluded that plaintiff will have to spend $1.5 million on 24-hour attendant care throughout her lifetime. On cross-examination, Dr. Arkin admitted he never personally examined plaintiff but testified that he reviewed her medical records.

¶ 16        Dr. Aghi testified that a neurosurgeon treating a patient like plaintiff would comply with the standard of care by: (1) performing a surgical resection, (2) performing a biopsy, or (3) following a "watching and waiting" approach. Dr. Aghi testified that a "watching and waiting" strategy requires repeat MRIs at "tight intervals" of six months or less.

5

¶ 17    Dr. Aghi agreed that if left untreated, glioma will spread and invade other areas of the brain, which is what happened to plaintiff. Dr. Aghi believed plaintiff's tumor was "amenable to surgical resection" in 2009 and early 2010. Dr. Aghi agreed "there was no harm done to [plaintiff] from August to December [2009], based on the MRI images and her options as of December or January of 2010." Dr. Aghi concluded that the delay in diagnosing and treating plaintiff's brain tumor caused plaintiff's neurocognitive dysfunction and shortened her life expectancy.

¶ 18    Dr. Batchelor testified, over Dr. Zhang's objection, that the standard of care for a neuro-oncologist with a patient who had an MRI like plaintiff's in August 2009 required referral to a neurosurgeon. Based on the appearance of plaintiff's tumor in August 2009, Dr. Batchelor testified he would have recommended "at a minimum a biopsy, if not a resection." Based on the results of the biopsy, he would have expected "a gross total resection" to be performed. Such a procedure would have prevented the tumor from growing and extending into multiple areas of the brain. Dr. Batchelor testified that "a lack of treatment between 2009 and 2014" led to the growth of plaintiff's tumor, causing it to infiltrate multiple lobes of the brain. Dr. Batchelor admitted that if plaintiff's tumor had been surgically resected, plaintiff would likely have a recurrence sometime during her lifetime because tumors "almost inevitably recur." He testified that upon recurrence, plaintiff would be treated with focal radiation, which has "[f]ar less risk" than whole-brain radiation.

¶ 19    Plaintiff also presented the testimony of Dr. Nancy Landre, a neuropsychologist. She testified that it is common for patients who have undergone whole-brain radiation to have cognitive symptoms affecting thinking, memory, processing speed, and executive functions. Dr. Landre administered several tests to plaintiff in 2017 and 2020, which showed plaintiff was "mildly impaired" in psychomotor speed, "moderately impaired" in mental flexibility, and "significantly impaired" in non-verbal problem solving, encoding new information, and memory. Dr. Landre

6

concluded that plaintiff "demonstrated consistent evidence of memory impairment." Dr. Landre opined that plaintiff suffered cognitive injuries because of whole-brain radiation that are "permanent" and will worsen as she ages.

¶ 20    Plaintiff's son, Slavisa Ris, was 25 years old at the time of trial. He testified that he lives with plaintiff. Slavis testified that prior to 2014, plaintiff was independent and took care of the household herself. Now, Slavisa said he takes care of household finances because plaintiff "forgets sometimes what bills she's paid." He testified that plaintiff suffers from "short-term memory problems." Slavisa is uncomfortable with plaintiff being home alone because of her memory problems. He testified that plaintiff does not go anywhere alone because "she can't drive, she gets dizzy, [and] her concentration is bad."

¶ 21    Plaintiff's sister, Marjana Balic, testified that plaintiff has experienced "a lot of memory problems" since her whole-brain radiation. She said plaintiff spends very little time home alone because Marjana feels "it's not safe to leave her home alone." According to Marjana, plaintiff has suffered falls and forgotten to take her medication.

¶ 22    Plaintiff testified that she came to the United States from Bosnia in 2003, with her son and husband. At that time, she spoke no English. She began working at Kohl's in 2004, where she learned English. In 2009, she obtained a second job at Good Samaritan. When plaintiff went to the emergency room at Good Samaritan on August 25, 2009, she was not a patient of Dr. Zhang's and did not ask to see Dr. Zhang.

¶ 23    When plaintiff went to Dr. Zhang's office in January 2010, she brought an electronic copy of her December 2009 MRI. Plaintiff looked at the images with Dr. Zhang but did not understand them. Dr. Zhang did not show her the MRI report and did not tell her that the radiologist recommended she have a repeat MRI in six months. Plaintiff said Dr. Zhang told her she did not

7

have cancer or a tumor but had "chronic migraines" and treated her for those. Dr. Zhang never mentioned plaintiff having another MRI after December 2009.

¶ 24        Plaintiff continued to work at Good Samaritan until 2014. When plaintiff underwent whole-brain radiation in 2014, she said she had "[n]o energy, weakness, was "nauseous all the time" and could barely walk. Plaintiff testified she no longer works, never leaves the house alone, and has to rely on others.

¶ 25        Dr. Keith Schaible, a neurosurgeon, testified he performed a biopsy on plaintiff's brain tumor on August 1, 2014. Dr. Schaible testified that surgery was not an option for plaintiff in 2014 because the tumor "involved areas of the brain that were not accessible to surgery without significant risk in terms of neurological function."

¶ 26        After plaintiff's witnesses testified, Dr. Zhang and Advocate filed motions for a directed verdict, which the trial court denied. Plaintiff orally moved that Dr. Zhang's medical corporation be voluntarily dismissed from the action. The trial court granted that motion and entered an order voluntarily dismissing Li Zhang, M.D., S.C., as a defendant.

¶ 27        Dr. Zhang and Advocate presented the testimony of several experts: Dr. Terence Roberts, a radiation oncologist; Dr. Joel Meyer, a neuroradiologist; Dr. Herbert Engelhard, a neurosurgeon; and Dr. Martin Kelly Nicholas, a neuro-oncologist. They all testified that plaintiff's August 2009 and December 2009 MRIs were essentially the same and did not show a single tumor contained in the right frontal lobe but showed "gliomatis cerebri," tumor cells spread throughout plaintiff's brain.

¶ 28        Dr. Roberts testified that "it is not possible" that plaintiff's tumor was localized to one lobe in 2009 based on the presence of tumors in many other lobes in 2014. He testified that surgical intervention in 2009 would not have changed plaintiff's outcome because surgery "would have

8

only treated a portion of her tumor." He opined that if the tumor in the right frontal lobe had been removed in 2009, other tumors would have appeared and required whole-brain radiation. Dr. Roberts testified that the five-year delay, from 2009 to 2014, in identifying and treating plaintiff's brain tumor did not alter plaintiff's outcome, change her treatment, or change her "overall survival chances."

¶ 29    Dr. Meyer testified that plaintiff's MRI from August 2009 showed "abnormalities outside the right frontal lobe." He opined that in 2009, plaintiff's tumor was "[n]ot amenable to be taken out" because it was in multiple areas of her brain. He further opined that Dr. Zhang's delay in diagnosing plaintiff's tumor did not cause any harm to plaintiff because plaintiff's condition was "noncurable." Dr. Meyer agreed that "[m]ore likely than not" plaintiff was injured by whole-brain radiation because she "suffered brain volume loss," which means her brain shrunk.

¶ 30    Dr. Engelhard testified that the standard of care did not require a biopsy or surgical resection of plaintiff's tumor in 2009. Dr. Engelhard opined that observation or "watchful waiting" was a reasonable course of action at that time. He agreed that watchful waiting required "serial MRI scans" every three to twelve months. He testified that "an aggressive surgical resection" in 2009 would not have cured plaintiff because it would not have removed all the tumor cells. He testified that plaintiff's 2009 MRIs showed that "[t]his is not a curable tumor." Dr. Engelhard opined that aggressive resection in 2009 or 2010 would not have altered plaintiff's outcome because plaintiff "would have winded up needing radiation therapy and chemotherapy anyway."

¶ 31    Dr. Nicholas agreed that observation, biopsy and resection are all reasonable options for someone who presented like plaintiff with low-grade glioma in 2009. He explained that surgical resection does not cure a patient like plaintiff because "there will be cells left behind" that will

9

grow. Dr. Nicholas opined that Dr. Zhang violated the standard of care "when she failed to follow up on the MRI scans" but did not violate the standard of care in any other way.

¶ 32 During closing arguments, plaintiff's attorney stated:

"You will notice that the hospital in this case called expert witnesses on many issues. But the hospital did not defend, nor did it hire an expert to defend Dr. Zhang's conduct in this case."

Dr. Zhang's counsel objected, and the trial court overruled the objection. Plaintiff's attorney continued:

"You may have noticed that there were specific experts in many fields, but nobody in the field of neurology to defend Dr. Zhang's conduct. Dr. Zhang did not present any defense through an expert witness as it relates to her failure to give informed consent."

Plaintiff's counsel again objected, and the trial court overruled the objection, stating: "The jury has heard the evidence."

¶ 33 Prior to deliberations, the jury was given various instructions, including the following instruction about closing arguments:

"The closing arguments given at the conclusion of the case are a summary of what the attorneys contend the evidence has shown. If any statement or argument of an attorney is not supported by the law or the evidence, you should disregard that statement or argument." See Illinois Pattern Jury Instruction, Civil, No. 1.01(C)[13] (2022) (hereinafter IPI Civil (2022)).

The jury was also given the following instruction regarding the burden of proof:

"The plaintiff has the burden of proving each of the following propositions as to the defendant:

10

First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions, and in so acting, or failing to act, the defendant was negligent;

Second, that the plaintiff was injured;

Third, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

If you find from your consideration of all the evidence that any of these propositions has not been proved as to the defendant, then your verdict shall be for the defendant. On the other hand, if you find from your consideration of all the evidence that all of these propositions have been proved as to the defendant, then your verdict shall be for the plaintiff and against the defendant." See IPI Civil (2022) No. 21.02.

¶ 34 Over plaintiff's objection, Advocate tendered two special interrogatories to the court, which the court submitted to the jury: (1) "Was Li Zhang, M.D. the apparent agent of Advocate *** in 2009?"; and (2) "Was Li Zhang, M.D. the apparent agent of Advocate *** from 2010 through 2014?"

¶ 35 The jury found Dr. Zhang liable and Advocate not liable and determined plaintiff's damages to be $3,350,000, which included $1,500,000 for "[t]he reasonable expense of necessary services reasonably certain to be received in the future." With respect to the special interrogatories, the jury responded "Yes" to the first and "No" to the second. Dr. Zhang filed a motion seeking a new trial, and plaintiff filed a motion seeking judgment against Advocate or, alternatively, a new trial. The trial court denied both motions.

¶ 36                                          ANALYSIS

¶ 37                                               I.

11

¶ 38 Dr. Zhang first argues that the trial court erred in denying her motion to dismiss plaintiff's complaint because it was barred by the statute of repose.

¶ 39 The Code of Civil Procedure (Code) (735 ILCS 5/13-212(a) (West 2016)) imposes a four-year statute of repose on causes of action for professional medical negligence. *Hanks v. Cotler*, 2011 IL App (1st) 101088, ¶ 18. Section 13-212(a) of the Code provides that an action for damages against a physician or hospital may not be brought "more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." 735 ILCS 5/13-212(a) (West 2016).

¶ 40 However, "a plaintiff is not barred by the statute of repose if she can demonstrate that there was an ongoing course of continuous *negligent* medical treatment." (Emphasis in original.) *Cunningham v. Huffman*, 154 Ill. 2d 398, 406 (1993). "To prevail under this cause of action a plaintiff must demonstrate: (1) that there was a continuous and unbroken course of *negligent* treatment, and (2) that the treatment was so related as to constitute one continuing wrong." (Emphasis in original.) *Id.* Under this doctrine, the negligent medical treatment continuum begins with the defendant's first negligent medical treatment and continues until the defendant's last negligent treatment, at which point the repose period begins to run. *Ferrara v. Wall*, 323 Ill. App. 3d 751, 756 (2001) (citing *Cunningham*, 154 Ill. 2d at 405).

¶ 41 In this case, Dr. Zhang first treated plaintiff at Good Samaritan in September 2009, and continued treating plaintiff several times a year until January 2014. Plaintiff filed her medical negligence complaint against Dr. Zhang in 2016, alleging that Dr. Zhang negligently treated her from 2009 to 2014, by failing to (1) appreciate the significance of the abnormal findings on her 2009 MRIs, (2) order follow-up imaging after December 2009, (3) order appropriate diagnostic

12

testing, (4) order a biopsy, (5) diagnose and treat her for glioma, and (6) refer her to a neurosurgeon.

¶ 42 Plaintiff's complaint adequately alleged a continuing course of negligent medical treatment by Dr. Zhang that began in 2009 and continued until January 2014, the last date Dr. Zhang treated plaintiff. Thus, the statute of repose began running in January 2014. See *Cunningham*, 154 Ill. 2d at 406; *Ferrara*, 323 Ill. App. 3d at 756. Plaintiff filed her complaint in 2016, well before expiration of the four-year statute of repose. See 735 ILCS 5/13-212(a) (West 2016). Thus, the trial court properly denied Dr. Zhang's motion to dismiss.

¶ 43                                                    II.

¶ 44 Dr. Zhang next argues that the trial court erred in allowing Dr. Aghi and Dr. Batchelor to testify about the standards of care in their respective medical fields. She contends that their testimony was cumulative to that of Dr. Arkin, so the trial court should have barred it.

¶ 45 A plaintiff in a medical malpractice case must prove (1) the standard of care against which the physician's conduct must be measured, (2) that the defendant was negligent by failing to comply with that standard, and (3) that the defendant's negligence proximately caused the plaintiff's injuries. *Freeman v. Crays*, 2018 IL App (2d) 170169, ¶ 21. "The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty." *Krivanec v. Abramowitz*, 366 Ill. App. 3d 350, 356-57 (2006).

¶ 46 The admission of evidence is left to the discretion of the trial court. *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 155 (1997). The trial court may, in its discretion, exclude cumulative evidence. *Id*. The trial court's decision to admit or exclude evidence will be disturbed only when there is a "clear abuse of discretion." *Id.*

¶ 47        Medical expert testimony is not cumulative if physicians from various medical specialties testify about their respective medical specialties and the standards of care applicable thereto. See *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 781 (1998). Additionally, testimony from multiple medical experts is not cumulative where one is a specialist in the defendant's field of medicine and testifies about the standard of care applicable thereto and another is a specialist in another field of medicine and offers opinions on causation. See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 45-46 (2010).

¶ 48        At trial, Dr. Arkin testified as a neurologist and the standard of care applicable to a neurologist, like Dr. Zhang. In contrast, Dr. Aghi testified as a neurosurgeon and the standard of care applicable thereto, while Dr. Batchelor testified as a neuro-oncologist and the standard of care applicable thereto. Because Dr. Aghi and Dr. Batchelor testified about the standards of care applicable to their respective specialties, which were different than Dr. Arkin's, their testimony was not cumulative of Dr. Arkin's testimony. See *Dahan*, 295 Ill. App. 3d at 781.

¶ 49        Moreover, the testimony of Dr. Batchelor and Dr. Aghi was not cumulative of Dr. Arkin's because it was offered for a different purpose. Dr. Arkin's testimony was necessary to establish the first two elements of plaintiff's malpractice claim against Dr. Zhang: (1) the standard of care applicable to Dr. Zhang, a neurologist, and (2) that Dr. Zhang was negligent by failing to comply with that standard of care. See *Freeman*, 2018 IL App (2d) 170169, ¶ 21. However, the testimony of Dr. Aghi and Dr. Batchelor was offered for a different purpose -- to establish that Dr. Zhang's negligence proximately caused plaintiff's injuries. See *id*. Expert testimony was necessary to prove that element of plaintiff's case. See *Krivanec*, 366 Ill. App. 3d at 356-57. Because the testimony of Dr. Aghi and Dr. Batchelor was offered to prove causation, rather than the standard of care

14

applicable to Dr. Zhang, that testimony was not cumulative to Dr. Arkin's, and the trial court did not abuse its discretion in allowing it. See *Cetera*, 404 Ill. App. 3d at 45-46.

¶ 50                                                    III.

¶ 51            Next, Dr. Zhang argues that the trial court erred in overruling her objections to statements made by plaintiff's counsel during closing arguments about defendants' failure to call a witness to defend Dr. Zhang's conduct.

¶ 52            "Attorneys are permitted wide latitude in their closing arguments." *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 46 (citing *Guzeldere v. Wallin*, 229 Ill. App. 3d 1, 13 (1992)). "Comments on evidence during closing argument are proper 'if they are either proved by direct evidence or are a fair and reasonable inference from the facts and circumstances proven.' " *Id*. ¶ 47 (quoting *Guzeldere*, 229 Ill. App. 3d at 13); see also *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 484 (1985) ("an attorney may argue the evidence and reasonable inferences from it").

¶ 53            In closing arguments, counsel can point out that his or her client presented unrebutted expert testimony on an issue. See *Kinzinger v. Tull*, 329 Ill. App. 3d 1119, 1128 (2002); *Lebrecht*, 130 Ill. App. 3d at 484. Counsel can also assert during closing arguments that the opposing party did not call an expert witness because it "couldn't find one" who would contradict the opinions provided by his or her client's experts. See *Wilson*, 2019 IL App (1st) 173065, ¶ 50; *Kinzinger*, 329 Ill. App. 3d at 1127-28.

¶ 54            Improper remarks during closing argument generally do not constitute reversible error unless they result in substantial prejudice. *Ittersagen v. Advocate Health and Hospitals Corp.*, 2020 IL App (1st) 190778, ¶ 87, *aff'd,* 2021 IL 126507. Substantial prejudice means that, absent the remarks, the outcome of the trial would have been different. *Id.* If counsel makes inappropriate statements during closing argument, the error is generally cured if the trial court instructs the jury

that "closing arguments are not evidence and that any argument not based on the evidence should be disregarded." *Wilson*, 2019 IL App (1st) 173065, ¶ 51 (citing *Lecroy v. Miller*, 272 Ill. App. 3d 925, 933 (1995)).

¶ 55　　　　In examining whether a party has been denied a fair trial because of an opposing party's closing argument, considerable deference is extended to the trial court's judgment because the trial court is in a superior position to assess the accuracy and effect of counsel's statements. *In re Salmonella Litigation*, 198 Ill. App. 3d 809, 820 (1990). Thus, the trial court's ruling will not be disturbed unless there is a clear abuse of discretion. *Oak Brook Park District v. Oak Brook Development Co.*, 170 Ill. App. 3d 221, 241 (1988).

¶ 56　　　　Here, plaintiff's counsel's twice stated during closing arguments that defendants failed to call an expert witness to defend Dr. Zhang's conduct. Dr. Zhang's counsel objected to these statements, and the trial court overruled the objections. Dr. Zhang contends that plaintiff's counsel's comments deprived her of a fair trial by shifting the burden of proof. We disagree.

¶ 57　　　　Plaintiff's counsel's statements about defendants' failure to present an expert witness to defend Dr. Zhang's conduct was a proper argument based on the evidence. See *Wilson*, 2019 IL App (1st) 173065, ¶ 50; *Kinzinger*, 329 Ill. App. 3d at 1127-28; *Lebrecht*, 130 Ill. App. 3d at 484. Moreover, even if the comments were improper, they did not deprive Dr. Zhang of a fair trial because the comments were cured by the trial court's instructions to the jury. See *Wilson*, 2019 IL App (1st) 173065, ¶ 51. Here, the trial court instructed the jury: "A closing argument is given at the conclusion of the case and is a summary of what an attorney contends the evidence has shown. If any statement or argument of an attorney is not supported by the law or the evidence, you should disregard that statement or argument." See IPI Civil (2022) No. 1.01(C)[13]. The trial court also instructed the jury that plaintiff had the burden of proving defendants' negligence. See IPI Civil

16

(2022) No. 21.02. Under these circumstances, we cannot say that the comments of plaintiff's counsel during closing arguments substantially prejudiced Dr. Zhang so that the outcome of the trial would have been different if the statements had not been made. See *Ittersagen*, 2020 IL App (1st) 190778, ¶ 87.

¶ 58                                           IV.

¶ 59        Dr. Zhang also argues that the trial court abused its discretion in allowing Advocate's special interrogatories to be provided to the jury and entering a verdict in favor of Advocate in light of the jury's answers to the special interrogatories. She contends that the jury's answers to the interrogatories and its verdict in favor of Advocate were irreconcilably inconsistent.

¶ 60        "A special interrogatory is a question posed to the jury for its consideration during deliberations that supplements its consideration of the case[.]" *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 117. The purpose of a special interrogatory is "to test a general verdict against the jury's conclusion on one or more specific issues of ultimate fact." *Id*. "A special interrogatory serves 'as guardian of the integrity of a general verdict in a civil jury trial.' " *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002) (quoting *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 460 (1996)).

¶ 61        "A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Id.* "If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable' and the special finding will not control." *Id.* at 556. "In determining whether answers to special

17

interrogatories are inconsistent with a general verdict, all reasonable presumptions are exercised in favor of the general verdict." *Id*.

¶ 62    When the general verdict and the answer to the special interrogatory are not "clearly and absolutely irreconcilable," the trial court should enter judgment in accordance with the general verdict. See *Stanphill v. Ortberg*, 2017 IL App (2d) 161086, ¶ 29 (citing *Simmons*, 198 Ill. 2d at 556). Courts are reluctant to set aside a general verdict "unless the special findings exclude every reasonable hypothesis consistent with the general verdict." *Patur v. Aetna Life & Casualty*, 90 Ill. App. 3d 464, 468 (1980).

¶ 63    A trial court's decision to grant or deny a party's request for a special interrogatory is reviewed for an abuse of discretion. *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶ 28. We review *de novo* whether the jury's answer to a special interrogatory is inconsistent with a general verdict. See *McCutchen v. Bigler*, 101 Ill. App. 3d 696, 697 (1981) (whether general verdict and special interrogatory are inconsistent is question of law); *Leonard v. Illinois Department of Employment Security*, 311 Ill. App. 3d 354, 356 (1999) (questions of law are subject to *de novo* review).

¶ 64    In this case, plaintiff alleged that Advocate was liable for her injuries based on the doctrine of apparent agency/apparent authority. Under this doctrine, a hospital can be held vicariously liable for the negligent acts of a physician providing care at the hospital even if the physician is an independent contractor unless the patient knows or should have known that the physician is an independent contractor. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524 (1993). For a hospital to be liable under the doctrine, the plaintiff must show (1) the hospital held the physician out as having authority or knowingly acquiesced in the physician's exercise of authority; (2) based on the acts of the principal and agent, the plaintiff reasonably concluded that an agency relationship existed; and (3) the plaintiff reasonably relied on the physician's apparent authority to her

18

detriment. See *id.* Whether a physician is an apparent agent of a hospital is a question of fact. See *id*. at 524.

¶ 65    Dr. Zhang contends that the jury's affirmative response to the first special interrogatory, which asked if Dr. Zhang was an apparent agent of Advocate in 2009, is "clearly and absolutely irreconcilable" with its general verdict in favor of Advocate. We disagree.

¶ 66    The jury could have found that Dr. Zhang was an agent of Advocate in 2009, but was not guilty of negligence and/or did not cause an injury to plaintiff until 2010 or thereafter, when she was no longer an apparent agent of Advocate. That conclusion is supported by the testimony of defendants' experts, Dr. Nicholas and Dr. Engelhard, who opined that Dr. Zhang did not breach the standard of care until she failed to obtain serial imaging of plaintiff in 2010 and thereafter. That conclusion is also supported by plaintiff's expert, Dr. Aghi, who testified "there was no harm done" to plaintiff by Dr. Zhang in 2009. Because the jury's answer to the special interrogatory and its general verdict were not "clearly and absolutely irreconcilable," the jury's verdict must stand. See *Stanphill*, 2017 IL App (2d) 161086, ¶ 29.

¶ 67    Furthermore, Dr. Zhang forfeited her claim that the jury's answer to the first special interrogatory and the general verdict in favor of Advocate were inconsistent by failing to object before the jury was discharged. The Code states: "When any special finding of fact is inconsistent with the general verdict, the court shall direct the jury to further consider its answers and verdict." 735 ILCS 5/2-1108 (West 2020). If a party believes a special interrogatory and general verdict are inconsistent, it must object as soon as the jury returns its verdict and answer. See *Strauss v. Stratojac Corp.*, 810 F.2d 679, 682-83 (7th Cir. 1987) (analyzing section of Federal Code of Civil Procedure nearly identical to section 2-1108 of the Code). A party's failure to object while the jury is still present in the courtroom results in the party's forfeiture of an objection to an alleged

19

inconsistency between the special interrogatory and the general verdict. See *id*. at 683; *Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 515 (5th Cir. 2020); *DiBella v. Hopkins,* 403 F.3d 102, 117 (2d Cir. 2005); *Howard v. Antilla*, 294 F.3d 244, 250 (1st Cir. 2002). Because Dr. Zhang did not object to the alleged inconsistency between the jury's answer to the special interrogatory and its general verdict while the jury was still empaneled, she forfeited her claim that the answer and interrogatory were irreconcilably inconsistent.

¶ 68                                                                    V.

¶ 69        Finally, Dr. Zhang argues that the trial court abused its discretion by allowing Dr. Arkin to testify regarding the cost of future expenses plaintiff will incur as a result of her brain injuries. Dr. Zhang contends that Dr. Arkin's testimony was speculative and not based on his own examination of plaintiff.

¶ 70        Generally, expert testimony will be admitted if the expert has some experience and knowledge that is not common to laypersons and his testimony will aid the jury. *Kunz v. Little Co. of Mary Hospital & Health Care Centers*, 373 Ill. App. 3d 615, 624 (2007) (citing *Thompson v. Gordon,* 221 Ill. 2d 414, 428 (2006)). An expert may acquire specialized knowledge or experience through practical experience, scientific study, education, training or research. *Id*. (citing *Thompson,* 221 Ill. 2d at 428-29). "An expert need only have knowledge and experience beyond that of an average citizen." *Thompson,* 221 Ill. 2d at 429. Accordingly, "[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Snelson v. Kamm,* 204 Ill. 2d 1, 24 (2003).

¶ 71        A medical expert witness may not base his opinions on guess, conjecture, or speculation. *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000). However, an expert witness is permitted to

20

provide an opinion based on facts not within his personal knowledge if those facts are of the type reasonably relied upon by experts in the particular field. *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 407 (2010). "Illinois law does not require an expert witness to physically examine or personally know the patient in order to render an expert opinion in the case." *In re Estate of Hoover*, 155 Ill. 2d 402, 421 (1993).

¶ 72    The decision to allow an expert to testify lies within the "sound discretion of the trial court." *Thompson,* 221 Ill. 2d at 428. We may not disturb a circuit court's decision to allow expert witness testimony absent an abuse of discretion. *Kunz,* 373 Ill. App. 3d at 624.

¶ 73    Here, Dr. Arkin testified that he has treated patients with brain injuries like plaintiff's for 28 years and has helped coordinate care for those patients. Dr. Arkin testified that he reviewed plaintiff's medical records and determined that plaintiff required 24-hour care because of her brain injuries caused by whole-brain radiation. Dr. Arkin's conclusion is consistent with the testimony of plaintiff's sister and son, who testified that they do not feel comfortable leaving plaintiff alone because she has suffered falls, become confused, and forgotten to take her medication. Dr. Arkin's conclusion is also supported by the testimony of Dr. Landre, who performed neurological testing on plaintiff and determined that she suffers from permanent memory impairment, which will worsen as she ages. Because of Dr. Arkin's experience in treating patients with brain injuries like plaintiff, the trial court did not err in allowing Dr. Arkin to testify that plaintiff would need 24-hour assistance and supervision. See *Snelson,* 204 Ill. 2d at 24.

¶ 74    Dr. Zhang further contends that Dr. Arkin's testimony should have been barred because Dr. Arkin relied on plaintiff's counsel to help him determine the cost of 24-hour care for plaintiff. We disagree. Dr. Zhang testified that plaintiff's counsel provided him with the hourly rates of two agencies that provide the care plaintiff needs in the geographic area where she is located. Dr.

21

Zhang further testified that the rates charged by those agencies were similar to the rates charged in his geographic area for the care of patients, like plaintiff, with brain injuries. Dr. Arkin was not required to have personal knowledge of the hourly rate of attendant care where plaintiff lives but was allowed to obtain that information from an outside source since it was necessary for this determination of the future costs of plaintiff's care. See *Iaccino*, 406 Ill. App. 3d at 407.

¶ 75　　　　Finally, Dr. Zhang argues that the trial court should have prohibited Dr. Arkin's testimony because Dr. Arkin did not personally examine plaintiff. Again, we disagree. Here, Dr. Arkin was thoroughly cross-examined and admitted that he did not physically examine plaintiff. However, Dr. Arkin testified that he reviewed plaintiff's medical records, which physicians, like him, typically rely on. As our supreme court stated: "Illinois law does not require an expert witness to physically examine or personally know the patient in order to render an expert opinion in the case." *Hoover*, 155 Ill. 2d at 421.

¶ 76　　　　How much care plaintiff will need in the future and the cost of such care were not within the knowledge of members of the jury. Therefore, expert testimony was necessary to aid the jury in determining those issues. See *Kunz*, 373 Ill. App. 3d at 624; *Thompson,* 221 Ill. 2d at 428. The trial court did not abuse its discretion by allowing Dr. Arkin to testify about those issues based on his knowledge and experience.

CONCLUSION

¶ 77　　　　The judgment of the circuit court of Du Page County is affirmed.

¶ 78　　　　Affirmed.

22